NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TONY IRVING CABASSA CABRET, *Appellant*.

No. 1 CA-CR 24-0213

FILED 01-23-2025

Appeal from the Superior Court in Coconino County
No. S0300CR202200844
The Honorable Stacy Lynn Krueger, Judge

**AFFIRMED**

COUNSEL

Coconino County Legal Defender's Office, Flagstaff
By Joseph A. Carver
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Alice M. Jones, Madeline Shupe
*Counsel for Appellee*

_____

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Anni Hill Foster and Judge Paul J. McMurdie joined.

_____

**B R O W N**, Judge:

¶1            Tony Cabret appeals from his convictions and sentences for transportation of dangerous drugs for sale and transportation of narcotic drugs for sale.  For the following reasons, we affirm.

**BACKGROUND**

¶2            On the morning of July 23, 2022, Cabret was driving a rental car on Interstate 40 in Coconino County with a passenger.  A Department of Public Safety ("DPS") trooper noticed Cabret driving ten miles per hour above the posted speed limit and a cell phone was mounted to the windshield.  After initiating a traffic stop, the trooper informed Cabret he would receive a warning.  Cabret then agreed to sit in the front passenger seat of the patrol vehicle while the trooper wrote the warning.

¶3            Cabret explained that he and his passenger "Louie," who Cabret identified as his co-worker, were traveling from California to Tennessee for a two-day nutritional supplement convention.  Cabret said the event was in "downtown Tennessee," but he could not remember the specific city when the trooper asked about it.  Likewise, Cabret could not recall the name of the company he and Louie worked for, only that it was for a person named "Sean" who owned a warehouse.  The trooper eventually asked Cabret for permission to search the car, noting there was a significant problem with drug trafficking across state lines.  Cabret initially rebuffed the trooper's request, claiming that the only luggage was his bag in the car's rear seat.

¶4            After a few minutes, the trooper printed a warning and a form giving the trooper consent to search Cabret's car.  Again, Cabret rejected the request to search, and when the officer asked if he could bring a K-9 to sniff the car, Cabret stated, "if that's what you want to do."  While waiting for the K-9, the trooper asked if Cabret had anything in the SUV he was worried about.  This time, Cabret acknowledged there was "luggage" in the back, which he claimed was not his or Louie's, and that the luggage was in

the car when he rented it. Cabret also claimed they discovered the luggage at a gas station, but that Cabret never opened it and had no knowledge about its contents. Eventually, Cabret gave the trooper permission to remove and search the luggage, but the trooper decided to wait for the K-9 to arrive before conducting any search.

¶5 The trooper then spoke with Cabret's passenger. Contrary to Cabret's account, the passenger claimed to be heading to New Mexico, rather than Tennessee, to visit family. After the K-9 alerted to the car, the trooper found three bags in the car's cargo area, including a red suitcase containing what looked like a large quantity of methamphetamine. After Cabret and the passenger were arrested, the passenger was identified as Phillip Garcia rather than "Louie," as Cabret had stated earlier. A DPS officer later found additional bundles of drugs in the luggage, which appeared to contain fentanyl pills and fentanyl powder. Subsequent testing confirmed that the luggage in Cabret's car contained methamphetamine and fentanyl.

¶6 At the DPS facility, officers found a "Burlington" receipt in the car and when they asked Cabret whether he had purchased the cell phone mount from that store, he claimed he bought it at a gas station. However, video surveillance footage obtained from a Burlington store the evening before the stop shows Cabret and Garcia entering together, and Cabret appears to be buying an item resembling a cell phone car mount. The video also shows Garcia buying a large, red suitcase.

¶7 Cabret was charged with one count of sale or transportation of dangerous drugs for the methamphetamine, and one count of sale or transportation of narcotic drugs for the fentanyl. At trial, the two DPS officers who conducted the stop and search testified, as well as the forensic scientist who tested the drugs. Cabret and his son testified, each claiming that Cabret struggled with memory issues. Cabret also testified that he first met Garcia at a party several weeks before the stop, and that Garcia asked if Cabret could take him to New Mexico. Cabret acknowledged he had lied to the trooper when he claimed Garcia was his co-worker and that they were both going to Tennessee. Instead, Cabret claimed that he hoped Garcia would eventually become his co-worker. Cabret also recounted that he and Garcia had gone to a Burlington store before the trip; Garcia bought luggage and Cabret bought the cell phone mount. Again, Cabret acknowledged he lied to officers about not buying the mount at Burlington. Cabret also explained that just after noticing that a "police officer was behind us," Garcia urged him not to tell the officer about the luggage or the Burlington trip. Despite this, Cabret maintained that he never touched the

bag containing the drugs and had nothing to do with the luggage or its contents.

**¶8**    Before closing arguments, the court gave each juror a copy of the final instructions and read them aloud.  The document included an instruction on the State's burden to prove the elements of the charged crimes beyond a reasonable doubt, which tracked the language set forth in *State v. Portillo*, 182 Ariz. 592 (1995).  At the outset of the State's closing argument, the prosecutor urged the jury to consider direct and circumstantial evidence because "[t]here's no way to look into somebody's mind and know what they're thinking at a given second."  The prosecutor then explained:

> It's a difficult task trying to decide what a person was thinking.  But this is in the scope of the burden of proof the State has.  And what you have to conclude is that you're firmly convinced.  You're firmly convinced that the Defendant knew about the drugs.  All right?  You don't have to know beyond any doubt whatsoever.  As the jury instruction says, it's whether there's a *reasonable likelihood*.  Is there a *reasonable likelihood* that he didn't know that this is— that if there's a *reasonable likelihood* that he didn't know, then he should be found not guilty.

(Emphasis added.)   Defense counsel did not object, even though the prosecutor's references to "reasonable likelihood" differed from the "real possibility" language used in the *Portillo* instruction.

**¶9**    The jury convicted Cabret as charged.  The superior court later sentenced Cabret to concurrent prison terms of six years on the methamphetamine count and four and a half years on the fentanyl count. Cabret appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033.

## DISCUSSION

**¶10**    Cabret argues the State improperly characterized the reasonable doubt standard during closing arguments.  Because he did not raise an objection at trial to the prosecutor's closing arguments, we will not reverse unless Cabret can demonstrate fundamental, prejudicial error.  *State v. Escalante*, 245 Ariz. 135, 138, ¶ 1 (2018).

**¶11**    Recognizing the critical role the reasonable doubt standard plays in securing a defendant's due process rights, along with the difficulty

in defining the concept of reasonable doubt, in *Portillo*, 182 Ariz. at 596, our supreme court adopted a jury instruction that "most fairly and accurately conveys the meaning of reasonable doubt":

> The state has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as this, the state's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him/her guilty. *If, on the other hand, you think there is a real possibility that he/she is not guilty, you must give him/her the benefit of the doubt and find him/her not guilty.*

*Id.* at 596 (emphasis added). Cabret argues the State altered this burden when the prosecutor argued that Cabret should be found not guilty if the jury determined there was "a reasonable likelihood," rather than a "real possibility," that Cabret did not know about the drugs in the car. Cabret contends the prosecutor's use of the phrase "'reasonable likelihood' overstated the degree of doubt required for [an] acquittal." However, we need not determine whether the prosecutor erred, or the error would be fundamental, because even assuming the prosecutor inaccurately described that portion of the reasonable doubt instruction, Cabret has not established he was prejudiced.

**¶12**         Before addressing prejudice, we note that the importance of the reasonable doubt standard in criminal trials cannot be overstated. "The standard provides concrete substance for the presumption of innocence — that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (citation omitted). This standard is constitutionally required. *See id.* at 364 (holding "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (explaining that the Fifth and

Sixth Amendments require a jury to determine the State has established guilt beyond a reasonable doubt).

¶13        Consistent with these principles, our supreme court has specifically instructed courts and parties on how to describe the reasonable doubt standard, *Portillo*, 182 Ariz. at 596, and reaffirmed that language numerous times. *See, e.g., State v. Forde*, 233 Ariz. 543, 565, ¶ 86 (2014); *State v. Dann*, 220 Ariz. 351, 365, ¶ 65 (2009); *State v. Lamar*, 205 Ariz. 431, 440–41, ¶¶ 49–50 (2003) (collecting cases). Even seemingly minor alterations to this language can result in trial error. *See State v. Sullivan*, 205 Ariz. 285, 288, ¶¶ 13–16 (App. 2003) (finding error when a trial court replaced the final sentence of a *Portillo* instruction with "Otherwise, you must find the defendant not guilty"). Thus, we strongly urge parties to carefully follow the language of our supreme court's reasonable doubt instruction when addressing the jury because there is no need for attempts to alter or clarify the instruction. *See Portillo,* 182 Ariz. at 596 ("Use of a standard definition thus will eliminate confusion and foster fairness for defendants, the state, and jurors alike.").

¶14        To demonstrate prejudice, Cabret has the burden of showing that without the error, "a reasonable jury could have plausibly and intelligently returned a different verdict." *Escalante*, 245 Ariz. at 144, ¶ 31. This standard is not easily satisfied and is met only in "rare cases." *Id.* Prejudice is an objective inquiry that "necessarily excludes imaginative guesswork." *Id.* We consider the entire record to determine whether a defendant has shown prejudice, including the parties' arguments, theories of the case, and the evidence presented at trial. *Id.*

¶15        Cabret relies on our supreme court's decision in *State v. Murray*, 250 Ariz. 543 (2021), to support his argument that the prosecution's references to "a reasonable likelihood" prejudiced him. In that case, the court found that a single misstatement of the reasonable doubt standard constituted fundamental, prejudicial error when the prosecutor suggested to the jury that the State had met its burden of proof beyond a reasonable doubt if they thought "one or both defendants *might be guilty*." *Murray*, 250 Ariz. at 547, ¶ 6 (emphasis added). The court noted that the statements, which equated "reasonable doubt" with "might be guilty," provided the jury with a roadmap to "circumvent [the reasonable doubt standard] while ostensibly following it." *Id.* at 554, ¶ 39. Additionally, the statements were made during rebuttal closing, where the statements would have the greatest impact. *Id.* at 552, ¶ 32.

¶16     Cabret urges us to reach a similar conclusion in his case. But the prosecution's statement that the jury should acquit Cabret if there was a "reasonable likelihood" he was not guilty is distinguishable from the error in *Murray*. There, the supreme court explained that "[t]he prosecutor's comments' potential to mislead arises, therefore, not from any misstatement of the *Portillo* standard, but rather from the subtle conflating of 'might be guilty' with 'having been persuaded by the evidence in the case beyond a reasonable doubt.'" *Murray*, 250 Ariz. at 552, ¶ 33. Even assuming the prosecutor's statements in the present case were erroneous, they were only brief misstatements of the *Portillo* standard. And the superior court provided verbal and written instructions on the reasonable doubt standard that correctly tracked the language of *Portillo*. Unlike what occurred in *Murray*, these correct instructions could cure the issues with the prosecutor's improper phrasing. *See Sullivan*, 205 Ariz. at 289, ¶ 20 (finding that an edit of the *Portillo* instruction was harmless because the instruction still conveyed that the State bore the burden of proving each element beyond a reasonable doubt).

¶17     Additionally, the erroneous framing of the reasonable doubt standard in *Murray* was substantially more serious than the assumed error in this case. The *Murray* court explained that the "might be guilty" standard fell below even a preponderance of the evidence; in fact, the prosecution's characterization reflected something more akin to probable cause. *See Murray*, 250 Ariz. at 551, ¶ 23; *see also State v. Morris*, 246 Ariz. 154, 157, ¶ 9 (App. 2019) (describing probable cause standard as enough information to justify a reasonable belief that an offense has been committed and requiring only a substantial chance of criminal activity). Assuming there is a legal difference between a "reasonable likelihood" and a "real possibility" that Cabret was not guilty, the gap between those two is substantially less than the chasm between "probable cause" and "beyond a reasonable doubt."

¶18     Finally, unlike the situation in *Murray*, the prosecutor's misstatement at Cabret's trial did not occur during the rebuttal closing argument, when defense counsel would have had no opportunity to respond. *See Murray*, 250 Ariz. at 552, ¶ 32; *see also State v. Acuna-Valenzuela*, 245 Ariz. 197, 220, ¶ 91 (2018) (finding no prejudice when potentially erroneous statements shifting burden to the defendant occurred near the beginning of the closing argument, both parties discussed the reasonable doubt standard after the statements were made, and the court had provided proper instructions before closing). After consideration of the parties' arguments, the evidence presented at trial, and the context of the prosecutor's arguably improper characterization of the burden of proof,

Cabret has not shown that a reasonable jury could have plausibly and intelligently reached a different verdict.

**CONCLUSION**

¶19     We affirm.

